**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Rebecca Borough,                                    Case No. 3:14CV2789

         Plaintiff

         v.                                         **ORDER**

Tronair, Inc.,

         Defendant

This is a retaliation case under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and analogous state-law provisions.

The plaintiff, Rebecca Borough, was the Human Resources Manager for the defendant, Tronair, Inc. Borough came to believe Josh Green, a corporate Vice President, intended to fire three older employees because of their age. After Borough reported her concerns to her supervisor and the company's lawyer, Green allegedly retaliated against her by reassigning some of her job duties. Borough contends her working conditions then became so oppressive she had no choice but to resign.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367(a).

Pending are Tronair's motions for summary judgment (Doc. 17) and to strike two exhibits to Borough's opposition brief (Doc. 21). For the following reasons, I grant the motion for summary judgment and deny as moot the motion to strike.

**Background**

Tronair manufactures and distributes ground-support equipment for airplanes.

The company hired Borough as an accountant in 2001. Soon thereafter, Borough began sharing responsibility for the company's HR operations with Jeff Lee, Tronair's Controller and Borough's direct supervisor.

Borough became the Director of the HR Department in 2012, while also continuing to perform certain accounting duties. She worked between forty and forty-five hours per week in 2012 and 2013; in 2014, Borough worked between forty-five and fifty hours per week.

In 2012 and 2013, Tronair had problems with two employees in its Purchasing Department: Kathy Horton (forty-seven years old) and Lori Baldwin (forty-eight years old).

According to her 2012 performance review, Horton "need[ed] development" in areas like initiative, decision-making, interpersonal skills, and dependability. (Doc. 17-7 at 8-9). Her "overall performance rating" was 2.4 out of 5.[1] (*Id.* at 13).

Baldwin's review urged her to "keep[ ] her accuracy and attendance at acceptable levels on a more consistent basis," and "to prepare better for meetings and think about what she is going to say before she addresses others." (*Id.* at 54). Baldwin's rating was 2.75. (*Id.* at 53).

Horton and Baldwin received even dimmer reviews in 2013: both rated a 2.3. (*Id.* at 15, 43).

Borough, as HR Director, was aware of Horton's and Baldwin's performance problems. (Doc. 17-4 at 2, 4).

In March, 2014, Tronair's Vice President for Strategic Planning, Josh Green, proposed reorganizing the Purchasing Department. (Doc. 17-6 at 2).

---

[1] Tronair used a five-point rating scale, with "1" signifying unsatisfactory performance and "5" signifying exceptional performance.

Green wanted to create a new position – the Strategic Sourcing and Materials Manager – to oversee the Department and "expand [its] ability to source Tronair's products." (Doc. 17-1 at 9). He offered the position to the head of the Department, Sue Russell (age fifty-six). Russell declined, however, as she was uninterested in the extra hours and responsibilities.

Although Green believed Russell was a sub-standard performer (Doc. 17-6 at 3-4), he wanted – in view of her "valued years of experience" with the company – to keep her in a non-supervisory role. (Doc. 17-2 at 2). He assigned her to work in a new position involving fewer responsibilities and, consequently, a lower salary. As a courtesy, however, Green directed that Russell continue receiving her former, higher salary through July, 2014.

Russell described this proposal as "very fair" and denied Green had tried to "force me out as an employee of Tronair." (Doc. 17-7 at 4).

The reorganization plan also entailed the probable firing of Baldwin or Horton, given their "poor" performance. (Doc. 17-6 at 2). In an outline detailing his plan, Green noted Horton and Baldwin "ha[d] both been warned on several occasions that they need to improve," but their "performance has yet to improve." (*Id.*).

Green had approached Borough, either in late 2013 or early 2014, to discuss the reorganization plan.

When he mentioned the prospect of firing Baldwin or Horton, Borough told Green "both women were in a protected class, and that neither had been disciplined for poor performance." (Doc. 18 at 7). And when Green mentioned the possibility of firing Russell, Borough said Russell, too, "was in a protected class, she was over 40, and . . . she hadn't had any [performance] issues that I was aware of." (Doc. 18-1 at 40).

3

Borough testified she never questioned the honesty of Green's assessment of Russell's performance, and that she never doubted Russell – who supervised Horton and Baldwin – honestly believed Horton's and Baldwin's performance was unsatisfactory.

Nevertheless, on the basis of these statements, Borough told Jeff Lee that "Josh was discriminating against older employees." (*Id.* at 15). Borough also twice contacted Tronair's attorney, Tom Dixon, and advised him Green "was trying to get rid of the older people, people over 40 in his department" and "trying to get rid of the old people in [the Purchasing Department]." (*Id.* at 15, 16).

At her deposition, Borough testified she never told Green she "felt he was engaged in acts of discrimination" with regards to firing Baldwin, Horton, or Russell. (*Id.* at 14). For his part, Green testified no one told him Borough had accused him of discriminating against older employees.

In March, 2014, Tronair fired Jeff Lee. One consequence was that Borough started reporting directly to Green. Green changed some of Borough's job duties, giving her new responsibilities while taking others away.

Borough's new duties included: 1) working with an outside recruiting agency, Key Recruiting, "to fill the global materials manager position"; 2) creating written policies and procedures to govern hiring decisions; 3) drafting a corporate-culture survey and ensuring job applicants completed it; and 4) establishing a summer-internship program. (Doc. 18-2 at 35).

Green also removed certain of Borough's duties after she reported a "dramatic[ ]" increase in her workload and reminded Green she was the only employee performing HR functions. (Doc. 18-1 at 28). In particular, Green proposed Borough "off-load" her accounting responsibilities

4

"so that she can focus more heavily on our recruiting, training and personnel evaluations efforts." (Doc. 17-4 at 25).

In mid-April, 2014, Tronair hired another recruiting agency, Triner Associates, to help find candidates for the company's open positions. The head of Triner Associates selected a recruiter, Tony Tarro, to work with Tronair to, *inter alia*, fill the new position in the Purchasing Department. Tarro worked at Tronair's office two or three days per week and remotely for the remainder of the week.

According to Green, he hired Triner to help Borough. Borough was, moreover, involved in the decision to hire Triner, and never objected or expressed concern about the decision.

Borough testified, however, the hiring of Tronair and Tarro came as a surprise and a disappointment, as Green had previously told her recruiting would be one of her key responsibilities. After Tarro began recruiting for Tronair, however, it remained Borough's responsibility to "manag[e]" Tronair's two other recruiters and "do[ ] evaluations and termination process documents." (Doc. 18-2 at 33).

In May, 2014, Tronair learned that its new Controller, Tammy Sprow, had received an offer to work for another company.

Hoping to induce Sprow to remain with Tronair, Green and Borough met on May 14 to discuss a counter-offer. When Green arrived in Borough's office, however, Borough told him she "wanted the same offer" the company would make to Sprow. (Doc. 18-1 at 31). Green said they would "have to talk about that at some other time," but Borough told him "[b]etter yet, I'm going to do you a favor and resign, effective immediately." (*Id.*).

5

Green tried to persuade Borough to reconsider her decision, or at least "sleep on it." She refused, however, and resigned on the spot.

Tronair hired Tarro as its HR Director in August, 2014.

It is undisputed that, during the two months Borough reported to Green, neither he nor Tronair: 1) reduced her salary or benefits; 2) demoted her; 3) required her to perform menial work; 4) reduced her workload; 5) disciplined her in any way; or 6) asked her to resign or accept an early-retirement offer.

Borough filed this suit in November, 2014, alleging: 1) Green reassigned some of her job duties as retaliation for accusing him of discriminating against older employees; and 2) Borough's working conditions under Green were so oppressive as to cause a constructive discharge.

## Discussion

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## A. Retaliation

The ADEA forbids an employer to discriminate against an employee who complained about illegal discrimination. 29 U.S.C. § 623(d).

To make out a prima facie case of retaliation, the employee must show: 1) she engaged in protected activity; 2) her employer knew she engaged in protected activity; 3) her employer took an adverse employment action against her; and 4) the adverse action was causally connected to the protected activity. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009).

The burden then shifts to the employer to "produce evidence of a legitimate, non-discriminatory reason for its actions[.]" *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

"If the [employer] satisfies this burden, the [employee] must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Id.* In other words, the employee must prove "not only that the Defendant's proffered reason was a pretext," but also that "the employer's action was intentional retaliation." *Id.*

### 1. Prima Facie Case

There is no dispute Borough engaged in protected activity by complaining to Jeff Lee and Tronair's attorney about Green's allegedly discriminatory conduct.

Tronair contends, however, Borough cannot make out a prima facie case because: 1) there is no evidence Green knew Borough had accused him of discriminating against older employees; 2) the reassignment of some of Borough's job duties was not an adverse employment action; and 3) there is no causal connection between Borough's complaints and the reassignment of her duties.

7

### a. Green's Knowledge

Borough contends she introduced sufficient evidence showing Green knew she had accused him of discrimination. According to Borough, "Green had conversed with [her] about his discriminatory intentions to terminate Sue Russell, and . . . Green was aware that [she] was raising those concerns with the Company attorney." (Doc. 18 at 18).

There is no evidence, however, from which a reasonable jury could find this was so.

Borough herself testified she never told Green she believed he was engaged in discriminatory behavior. (Doc. 18-1 at 14).

She also admitted she did not know whether Lee or Dixon "ever disclosed to [Green] that [she] had complained that he had been engaged in discrimination[.]" (*Id.* at 16). Green testified without contradiction, moreover, that "prior to this . . . lawsuit . . . nobody has ever told me that I was committing age discrimination[.]" (Doc. 18-2 at 13).

Ignoring this evidence, Borough points to Green's testimony that he knew Borough "had contact with the company attorney on the subject matter of Sue Russell." (Doc. 18-2 at 14).

But nothing in the record suggests Green knew what Borough's and counsel's discussion about Russell concerned – i.e., that Borough had complained to counsel Green was discriminating against an older employee. Rather, Green testified he "assum[ed]" Borough had contacted counsel to ensure Tronair "remain[ed] in compliance" with anti-discrimination laws in documenting Russell's poor performance. (*Id.*).

Borough also emphasizes that, after she told Green that Horton and Baldwin were in a "protected class," Green directed her "to contact Tom Dixon at Eastman & Smith, [and] see what could be done to put into place the plan to get rid of Kathy[.]" (Doc. 18-1 at 12). She stresses that

8

she told Green it was her job "to let him know what the situation was that could be discriminatory and so that we could avoid any type of lawsuit[.]" (*Id.* at 40).

Once again, however, this evidence provides no basis for inferring Green knew that Borough later complained to counsel that he was discriminating against older employees.

Nor could a jury reasonably conclude from this evidence that Green should have understood Borough had accused him of age discrimination. On its face, the evidence shows Borough alerted Green that certain disciplinary action he wished to take could appear discriminatory, and that Green directed Borough to consult with counsel in documenting employees' performance problems. Only by speculating could a jury find Green understood that Borough's neutral, non-accusatory statements were, in fact, claims that he was acting illegally

Finally, relying on *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134 (2d Cir. 2010), Borough contends Tronair's "general corporate knowledge" of her complaints – i.e., the knowledge Lee and Dixon possessed – suffices to show Green knew about her protected activity.

*Henry* is not on point.

That case involved a "cat's paw" situation, where "a corporate agent *carries out* an adverse employment action on the *orders*, explicit or implicit, of a superior with knowledge that the plaintiff has engaged in a protected activity." *Id.* at 148 (emphasis in original).

In this case, however, not only is there no evidence Green knew about Borough's protected activity, but there is also no evidence he took an adverse employment action "on the orders" of those who knew Borough had accused him of discrimination.

At bottom, there is no evidence from which a reasonable jury could conclude Green knew Borough had engaged in protected activity. And without that knowledge, there is no basis for finding

9

Green had grounds to retaliate against Borough. *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 483 (6th Cir. 2008) ("one cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so"); *Burks v. Union Pac. R. Co.*, 793 F.3d 694, 701 (7th Cir. 2015) ("Burks has provided no evidence that Kachnowski had any knowledge of Burks's prior race-discrimination complaint. Without that knowledge, Kachnowski would have had no basis for retaliatory behavior.").

For this reason alone, Tronair is entitled to summary judgment on the retaliation claims.

### b. Adverse Employment Action

An adverse employment action is a "materially adverse change in the terms or conditions of [one's] employment." *Kocsis v. Mutli-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

"Examples of adverse employment actions include hiring, firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." *Hodges v. City of Milford*, 918 F. Supp. 2d 721, 735 (S.D. Ohio 2013).

The plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

In contrast, "de minimis employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Therefore, "[a] change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis*, *supra*, 97 F.3d at 886.

Borough contends the reassignment of her accounting duties and Tronair's decision to hire Triner Associates to assist with recruitment efforts constitute adverse employment actions. (Doc. 18-2 at 65 (defining retaliation claim as Green "taking away some of my responsibilities")). She emphasizes Tronair hired the Triner firm shortly after Green had told her that recruiting duties "were her most important duties." (Doc. 18 at 21).

The Sixth Circuit has recognized "[r]eassignments . . . can qualify as adverse employment actions, particularly where they are accompanied by salary or work hour changes." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010).

Here, however, it is undisputed neither Green nor Tronair: 1) reduced Borough's salary or benefits; or 2) demoted or refused to promote her.

To be sure, there is no requirement a reassignment must come with a change in salary or hours to qualify as an adverse employment action. *Id.* But in those circumstances, the employee must produce evidence that, as a result of the reassignment, she "received a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities[.]" *Id.*

Borough has not produced that kind of evidence.

On the contrary, she testified the work she performed under Green's supervision was "important," and that she "didn't consider the work assignments degrading at all[.]" (Doc. 18-1 at 9). Borough acknowledged, moreover, "the work [she] performed in 2014 [was] similar to the work [she] had done in 2012 and '13[.]" (Doc. 18-1 at 9).[2]

---

[2] Although Borough's hours increased in 2014, she has not alleged the increased workload was an adverse employment action. (Doc. 18 at 21-22).

11

Furthermore, there is no evidence Borough lost all of her recruitment duties. She continued to manage two other recruiters working for Tronair while also handling other responsibilities – creating policies and procedures to govern hiring decisions, for example, and drafting a corporate-culture survey and incorporating it into the hiring process – directly relevant to Tronair's recruitment efforts.

Furthermore, Borough introduced no evidence the reassignment jeopardized her career at Tronair or impaired her chances for advancement.

Nor, finally, is there any evidence tending to show either Borough or her coworkers would have perceived her position as HR Director to be less prestigious after Green transferred certain of her job duties to other employees. *Cf. Spees*, *supra*, 617 F.3d at 392 (factual dispute existed whether employee's transfer to another position was adverse employment action, where employee "felt unchallenged by [the new] position" and testified "she found it to be 'more boring' than" her former position).

In these circumstances, a reasonable jury could conclude only that Borough experienced a mere – and non-actionable – change in job duties. *E.g.*, *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004) (reduction in size of plaintiff's lab space "did not amount to an adverse employment action" where plaintiff had "no evidence suggesting that the reduction . . . had a materially adverse effect on his salary or status of employment"); *Thomas v. AT&T Servs., Inc.*, 933 F. Supp. 2d 954, 965 (N.D. Ohio 2013) (Nugent, J.) ("Discipline, heightened supervision of Plaintiff's work, and the allocation of work duties . . . that Plaintiff finds objectionable" were *de minimis* "because they did not result in firing, demotion, suspension, loss of pay or loss of other benefits.").

### c. Causal Connection

An employer's knowledge of the employee's protected activity, coupled with a closeness in time between those complaints and an adverse employment action, can show a causal link. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). Although Green's alleged retaliation followed closely on the heels of Borough's protected activity, there is, as discussed above, no evidence Green knew Borough had accused him of discrimination.

Accordingly, Borough has failed to make out a prima facie case on this prong, too.

## 2. Pretext

Even if Borough had made out a prima facie case, her retaliation claim would fail for want of evidence showing a genuine factual dispute whether Tronair's grounds for reassigning some of her job duties were pretextual.

### a. Tronair's Stated Reasons

Tronair has introduced evidence showing Green reassigned Borough's duties because: 1) some of those duties – particularly her involvement in payroll and accounting matters – were not core HR functions; 2) the reassignment would give her more time to focus on her HR duties, including recruitment; and 3) Borough had reported a "dramatic" increase in her workload.

Borough does not dispute Tronair's first ground for the reassignment, and thus no reasonable jury could find Tronair acted pretextually by removing Borough's accounting functions because they were not true HR responsibilities.

Borough focuses on the sincerity of Green's claim he wanted to free up additional time so she could focus on core HR functions, including recruitment efforts. Borough contends this reason

must have been false, given that shortly thereafter Green hired Triner Associates and Tony Tarro to perform some recruiting functions.

Even viewed in the light most favorable to Borough, the hiring of Triner and Tarro is insufficient for a reasonable jury to find Green's reason pretextual.

For one thing, Borough does not meaningfully address Green's contention that the shifting of work duties, and the decision to hire Tarro, stem in part from Borough's complaint about her increased workload.

For another, Borough testified that, after Tarro came aboard, she continued to perform recruitment duties: she managed other recruiters, established hiring policies, created a survey all job applicants had to complete, and implemented a summer-internship program.

Finally, although Borough does not dispute telling Green her workload had increased "dramatically," she contends she "never requested Green reassign any of her job duties," and the reassignment "made [her] unhappy." (Doc. 18 at 26).

But these considerations are not probative of the sincerity of Green's belief that reassigning some of Borough's duties would ease her workload.

At this stage, it is Borough's burden to introduce evidence on which a reasonable jury could find not only Green's stated reasons were false, but also the true reason was to punish Borough for complaining about discrimination. The mere fact Borough might have been displeased with her reassigned duties would not permit a reasonable jury to conclude not only that Green was lying, but also that he was acting specifically to punish Borough for accusing him of discrimination.

### b. "Other Acts" Evidence

Borough also contends I can "consider 'evidence of other acts of discrimination' when evaluating whether a disputed fact exists as to pretext." (Doc. 18 at 27).

Here Borough points to Green's "handling of Lori Baldwin and Kathy Horton," and that of a third employee named John Rathman. In each case, Borough alleges, Green decided to fire these employees, set them up to fail by unreasonably increasing their workload, and issued a negative performance review documenting the anticipated failure.

As Borough notes, "evidence of other acts of discrimination" is admissible in employment cases to prove intent. *E.g.* Fed. R. Evid. 404(b); *Griffin v. Finkbeiner*, 689 F.3d 584, 598-99 (6th Cir. 2012).

At least two problems, however, prevent Borough from using such evidence here to prove pretext.

Most importantly, Borough has offered no evidence, whether by way of affidavit or deposition testimony, from the alleged victims of Green's "discrimination" themselves.

In the cases on which Borough relies on, the plaintiffs had adduced testimony from coworkers who claimed they, too, experienced the same kind of discrimination or retaliation the plaintiff had experienced. *E.g.*, *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1272 (11th Cir. 2008) ("Other black employees at Bagby Elevator testified that they also suffered discrimination."); *cf. Griffin*, *supra*, 689 F.3d at 591 (district court erred in excluding, after trial, testimony from plaintiff's African-American colleagues who alleged superiors retaliated against them).

But neither Baldwin, Horton, nor Rathman has claimed Green discriminated against them because of their age. Instead, Borough seeks to testify – speculate, really, as I show below – Baldwin, Horton, and Rathman were victims of Green's "discrimination."

Compounding that problem is the lack of a foundation showing the conduct Borough complains about was, in fact, actionable discrimination. Although Borough contends Green singled out Baldwin, Horton, and Rathman – all of whom were over forty – for firing, she testified unequivocally each employee had legitimate performance issues:

- Borough advised Tronair's CEO that Baldwin and Horton "had performance issues." (Doc. 18-1 at 21). Borough never questioned the *bona fides* of Green's belief those employees had legitimate performance problems. (*Id.* at 16, 34).

- Borough agreed Rathman made "inappropriate statements" by saying "how incompetent everyone at this company is." (*Id.* at 35). She also testified "[e]veryone" at Tronair "agreed that . . . Rathman had performance issues." (*Id.* at 45).

Given Borough's testimony that each employee whom Green singled out for firing had legitimate performance issues, there is no evidence on which a reasonable jury could find Green acted pretextually when he sought to fire those employees because of their performance issues.

Because Borough's "other acts" evidence is "based upon nothing more than suspicion and conjecture," it is insufficient to create a triable issue on the question of pretext. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 479 (6th Cir. 2002) (employer entitled to summary judgment on plaintiff's constructive-discharge claim because, although plaintiff "had some general 'suspicions' about a systematic plot to eliminate older employees, his feelings are based upon nothing more than suspicion and conjecture."); *see also Manuel v. City of Chicago*, 335 F.3d 592, 596-97 (7th Cir. 2003) (district court did not abuse discretion in excluding coworker's testimony that he believed supervisor's treatment of subordinates demonstrated that supervisor was racist).

16

**B. Constructive Discharge**

"A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

"To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Id.*[3]

The Sixth Circuit has identified seven factors bearing on whether a reasonable person would have felt compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001).

First, there is no basis for a reasonable jury to find Tronair created "intolerable working conditions."

On the contrary, it is undisputed Tronair did not: 1) demote Borough; 2) reduce her salary; 3) require her to perform menial or degrading work; 4) reassign her to work under a younger supervisor; 5) badger or harass her into resigning; or 6) ask her to retire or continue working on less favorable terms.

---

[3] For purposes of Ohio law, however, a plaintiff need not prove her employer acted with the intent to force her resignation. *Peters*, *supra*, 285 F.3d at 478.

17

Moreover, there is no evidence tending to show Borough contemplated quitting during the brief period she reported to Green. Such evidence could have provided some basis, however small, to believe Borough viewed her new working conditions as oppressive. But as far as the record here show, Borough decided to quit only after Green did not immediately agree to give her the same raise the company planned to offer Tammy Sprow.

Nor is there is record support for Borough's claim she "was forced to participate in discriminatory employment actions." (Doc. 18 at 33). As discussed above, Borough has either conceded, or failed to dispute, there were legitimate performance issues with Russell, Baldwin, Horton, and Rathman. Accordingly, she has no admissible evidence tending to show "forced participation" in discrimination against older employees.

Finally, the evidence does not support Borough's claim she was "forced to work with and train her direct replacement, Tony Tarro." (*Id.*).

When Tronair hired Tarro (via Triner Associates), Tarro was a part-time employee who worked at the Tronair offices only intermittently. Furthermore, Tronair did not hire Tarro as its HR Director until August, 2014, nearly three months after Borough quit the firm. There is no contemporaneous evidence showing Tronair intended to replace Borough with Tarro, or that Borough even believed this was the case.

With the exception of recruitment, moreover, there is no evidence Tarro was responsible for performing any other function of the HR Director position.

For these reasons, Tronair is entitled to summary judgment on Borough's state and federal constructive-discharge claims.

Second, there is no evidence on which a reasonable jury could conclude Tronair acted intentionally to force Borough's resignation. If anything, Green took pains, upon learning of her intent to resign, to keep her on the job. He asked her to reconsider, "sleep on it," or at least remain at her post for the rest of the day, until the company could find a substitute. This evidence, coupled with Borough's failure to produce any evidence that her working conditions were objectively intolerable, dooms her federal constructive-discharge claim.[4]

## Conclusion

It is, therefore

ORDERED THAT:

1. Tronair's motion for summary judgment (Doc. 17) be, and the same hereby is, granted; and

2. Tronair's motion to strike (Doc. 21) be, and the same hereby is, denied as moot.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[4] Given my disposition of the motion for summary judgment, I need not rule on Tronair's motion to strike. I will therefore deny that motion as moot.